## Sutton's Adm'r v. Kentucky Utilities Co.

(Decided March 8, 1932.)

(As Modified on Denial of Rehearing Nov. 15, 1932.)

B. B. SNYDER, C. B. UPTON, J. B. SNYDER and J. M. GILBERT for appellant.

GORDON, LAURENT & OGDEN, TYE, SILER, GILLIS & SILER for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The appellant's intestate, Clarence Sutton, a high school student, met with a tragic death by electrocution when he climbed out upon the beams of his school gymnasium and undertook to replace an exhausted light globe. A judgment against the appellee, Kentucky Utilities Company, rendered upon a charge of its responsibility, was reversed in Kentucky Utilities Company v. Sutton's Adm'r, 237 Ky. 772, 36 S. W. (2d) 380. In the opinion will be found a full statement of the facts and issues. Upon a return of the case, the appellant filed two amended petitions, and, when it

came on for trial, one other witness was introduced, and the entire record on the former trial was by stipulation considered in evidence. The court gave a peremptory instruction to find for the defendant, and from the judgment entered pursuant thereto this appeal is prosecuted.

On the former appeal, it was held that there had been shown no actionable negligence on the part of the defendant. Under the well known rule, that is the law of the case, so far as concerns the questions and issues presented by that record. We are to determine now only whether the additional evidence cured the case and rendered the record sufficient to authorize a submission of negligence to the jury. The questions already determined are reargued, and, in addition, it is contended that the company violated the rule that, where a power company has notice that wiring in a building over which it has no control is defective, and with such notice sends electricty in the defective system, and thereby causes damages, it is responsible. Ratliff v. Kentucky & West Virginia Power Company, 232 Ky. 262, 22 S. W. (2d) 620.

The new witness was at the time of the accident, and for some time theretofore had been, the local lineman and maintenance man of the Utilities Company, and seems to have been the local manager under the supervision of another residing at London. He had erected the service lines, installed the meter and made the connections with this building. The essence of his testimony is that, when the building was being erected and the lighting system installed, he saw that a certain flexible conduit was being improperly used in connection with the wall switch instead of a rigid conduit, to which he made objections to the chairman of the school board. This kind of conduit in a brick wall, he testified, had the effect of putting a ground into the system. But he does not say he then observed that the switch had been placed in what is called the neutral wire instead of hot wire; that is, the one carrying the current, but learned of it after the accident. That condition was not only shown conclusively by other witnesses, but is conceded by stipulation. However, the controlling point was knowledge of it by the company before the accident and it was not proven. While in attendance at games in the gymnasium the witness had noticed the unusual result of the lights on this circuit brightening

up instead of dimming when other circuits were turned on and the load increased. This, he said, indicated to him that there was a "leak". He testified that an inspection would have discovered the defective installation, but none was made. According to the witness, there were two 220-volt wires leading from the transformer into the building; then at the switch a third wire between these two, called a neutral; and that this deficient installation "possibly" permitted a leak of the electricity from one 220-volt wire to the other of the same power, with the result that, instead of one line carrying that current and another being a neutral or a ground wire, both lines carried the power. The evidence on the other trial was that the improper installation simply resulted in a "hot wire" being at all times connected with the socket instead of stopping at the switch and going through only when it was closed. The effect of this condition was that, when the switch at the panel was closed in order to light the lamps, instead of completing the circuit by connecting the "hot wire" with the neutral or ground wire with which the lamp was already directly connected, it closed the neutral or ground wire. So, if this open ground wire should have been closed in any manner—by either the switch or a contact with any thing connected with the ground—the circuit would be completed and the lights caused to burn. That explanation accounted for the fact that, when the body of the boy, resting on the steel beams of the building, touched the metal reflector with which the "hot wire" was connected, it closed the break in the ground and completed the circuit. Death resulted from the passing of the electricity through his body. The presence of a potential current at the socket, even though the switch was open, was no more dangerous than in instances where there is no wall switch and lights are turned on at the socket, or when the wall switch is closed and the current is carried through to the fixture, as in a floor lamp. This is manifested by the fact that a light in the basement on the same circuit was burning, even though the switch in the wall panel was open. In some way it must have been grounded, while those in the gymnasium were dark. The testimony of the new witness as to a leak at the panel board or the possibility of current in one 220-volt wire jumping to another is conclusively contradicted by all the admitted physical conditions.

Reference is made in the first opinion to a defective

light socket. This witness testified, as we understand
him, that a light socket such as this one, when in good
condition, has two contact screws. To one of them a
live wire is attached, which carries electricity to a term-
inal in the center of the socket; to the other the neu-
tral or ground wire is fastened, and that leads to the
brass outer shell. When a globe is screwed in and
comes in contact with this point, the circuit is complete
and the light burns. But there was a defect in the con-
nections in the socket which young Sutton was handl-
ing, so that the live wire was connected to the outside
shell and the neutral to the terminal up in the socket.
The metal cone shade or reflector on this light was
mashed, so that it touched the outer edge of the socket,
and this caused the reflector to become charged.

As stated in the first opinion, Sutton had removed
the light globe and received the deadly current when
he caught hold of the shade or reflector. The lights on
this circuit were not burning except one in the base-
ment, as said above, and it is apparent that, when the
boy, with his body wet with perspiration, resting on the
metal beam of the building, touched this shade, he com-
pleted the circuit. This is proven by the fact that other
lights on the circuit were at that instant lighted
momentarily.

The inevitable conclusion of the whole matter is
that the improper installation at the switch panel, of
which the company may be said to have had previous
notice, actual and constructive, was not the proximate
cause of the accident. But, for the defective condition
at the socket, no harm would have come to the boy. As
to this, there was no notice until after the accident, and
the company cannot be held responsible for sending cur-
rent into the system without knowledge, actual or con-
structive, of defective conditions causing injury. Causa
proxima, non remota spectatur, is a familiar maxim,
an interpretation of which is thus given by Cooley on
Torts, as quoted in City of Louisville v. Hart's Adm'r,
143 Ky. 171, 178, 136 S. W. 212, 215, 35 L. R. A. (N.
S.) 207:

> "If the injury has resulted in consequence of
> a certain wrongful act of omission, but only
> through some intervening cause, from which last
> cause the injury followed as a direct and immediate
> consequence, the law will refer the damage to the

last or proximate cause, and refuse to trace it to that which was more remote.''

The act of negligence relied on for recovery for an injury must have been the efficient procuring cause. To hold liable the originator, or one responsible for the first cause, the consequent chain of events must have been unbroken, for, if an independent cause intervenes which is sufficient to produce the result, it is regarded as the proximate cause, and the one responsible for the initial condition is relieved from liability. City of Louisville v. Hart's Adm'r, supra; L. & N. Railroad Company v. Napier, 223 Ky. 417, 3 S. W. (2d) 1070, 64 A. L. R. 513; Gaines' Adm'x v. City of Bowling Green, 235 Ky. 800, 32 S. W. (2d) 348.

Since the proximate cause of the death of the plaintiff's intestate was the defective light socket, of which the defendant had no notice, the trial court properly directed a verdict for the defendant. The judgment is therefore affirmed.